**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Jack BREWER, Defendant-Appellant.**

**No. 87–1431.**

United States Court of Appeals, Fifth Circuit.

Dec. 24, 1987.
Rehearing Denied Jan. 28, 1988.

---

David Godbey, Timothy A. Duffy (court appointed), Dallas, Tex., for defendant-appellant.

Sidney Powell, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GOLDBERG, WILLIAMS, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

A defendant appeals from his conviction for illegally possessing and trafficking in counterfeit long distance telephone service access codes, claiming that the statute under which he was convicted is not applicable to misuse of such codes. We are persuaded that the conduct complained of here falls under a practical reading of the statute and affirm.

I

Texas National Telecommunications is a long distance telephone company. A customer calls TNT's toll free phone number, punches in a personal access code, and if the access code is determined to be valid by the TNT computer, the customer gets a dial tone enabling him to place a long distance call. The call is then billed to the customer through the access number.

The government urged that Brewer was "hacking"—placing numerous calls to the TNT toll-free number and trying out various number combinations until he found one that the computer would accept as valid. By this process, it was urged, Brew-

er gathered a number of personal access codes that could be used to make long distance phone calls without identification of the user.

TNT became concerned about a large number of calls being charged to unassigned personal access codes and asked the Secret Service and Southwestern Bell Telephone Co. to investigate. The investigators traced calls placed to the 800 number to three phones—all owned by Brewer. The investigators estimated that Brewer would have thirty access codes at that time, and they cancelled all but five of them. Secret Service Agent Rico contacted Brewer and asked to purchase telephone service for a wide telemarketing research project. Rico met with Brewer on October 27, 1986 and asked him for 15 codes, and Brewer told him the fee would be $200 per code, giving him a list of around 17 codes. Rico used Brewer's phone, tried out each of the codes on the list, and reported that only five were working and that he would need more. The next morning, October 28, in a two hour period the investigators traced 57 phone calls placed from Brewer's phone to the TNT 800 number. That afternoon, Rico returned to Brewer's office and Brewer gave him the same list with new numbers penciled in. He again tested the numbers from Brewer's phone and verified that 17 of the new codes worked. Brewer wrote an invoice to Rico selling him the access codes for 14 days "replacement guaranteed."

This evidence was presented to a jury who convicted Brewer of violating 18 U.S. C. § 1029 by trafficking in counterfeit long distance access codes and possessing 15 or more counterfeit and unauthorized access devices on October 27, Counts 1 & 2, and of illegally trafficking in and possessing 15 or more counterfeit and unauthorized access devices on October 28, Counts 3 & 4. The court sentenced Brewer to five years in prison for Count 2 followed by concurrent terms of five years probation for Counts 2, 3, and 4.

Brewer appeals his conviction, arguing that Congress did not intend for 18 U.S.C. § 1029 to reach misuse of telephone access codes, and that even if the statute did apply, Brewer's specific conduct does not fall within the statute because (1) an access code cannot be both "unauthorized" and "counterfeit"; (2) a working access code cannot be "counterfeit;" and, (3) a terminated access code cannot be "unauthorized."

## II

■ Brewer was indicted under 18 U.S. C. §§ 1029(a)(1) and (a)(3), which provide:
(1) Whoever—

(1) knowingly and with intent to defraud produces, uses, or traffics in one or more counterfeit access devices;

[or]

. . . . .

(3) knowingly and with intent to defraud possesses fifteen or more devices which are counterfeit or unauthorized access devices;

. . . . .

shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section.

The statute also provides the following definitions:

(e) As used in this section—

(1) the term "access device" means any card, plate, code, account number, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument);

(2) the term "counterfeit access device" means any access device that is counterfeit, fictitious, altered, or forged, or an identifiable component of an access device or a counterfeit access device;

(3) the term "unauthorized access device" means any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud;

(4) the term "produce" includes design, alter, authenticate, duplicate, or assemble;

(5) the term "traffic" means transfer, or otherwise dispose of, to another, or obtain control of with intent to transfer or dispose of; and

(6) the term "device-making equipment" means any equipment mechanism, or impression designed or primarily used for making an access device or a counterfeit access device.

Although its legislative history suggests that the primary focus of section 1029 was to fill cracks in the criminal law targeted at credit card abuse, we are persuaded that Brewer's conduct is reached by a practical reading of the statute. Both the Senate and House Reports on the statute state that the definition of "access device" was intended to be "broad enough to encompass technological advances."[1] Both reports also make specific reference to personal identification codes such as those used to obtain cash from automatic teller machines.[2] Thus, although apparently this is the first case to do so, we need not stretch to read long distance access codes into the section 1029 definition of "access device."

■ Our reading denies none of Brewer's rights to due process because the language of the statute gives fair notice that misuse of a long distance access code constitutes a crime under section 1029. The test of whether a statute is unconstitutionally vague so as to deprive fair notice is whether it provides a person of ordinary intelligence a reasonable opportunity to know what is proscribed.[3] This test is met. Furthermore, "the requirement that statutes give fair notice cannot be used as a shield by one who is already bent on serious wrongdoing."[4] At the very least, Brewer must have known that hacking out long distance access codes to obtain free long distance service was "wrong."

1. *See,* S.Rep. No. 98–368, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Ad.News 3182, 3647, at 3655; H.R.Rep. No. 98–894, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Ad.News 3689, at 3705.

2. S.Rep. at 3656; H.Rep. at 3705.

3. *Home Depot, Inc. v. Guste,* 773 F.2d 616 (5th Cir.1985).

## III

Brewer argues that even if abuse of long distance codes falls within the statutory language, his conviction is improper, first because a long distance code cannot be both a "counterfeit access device" and an "unauthorized access device"; second, because a working long distance code cannot be a "counterfeit access device"; and third, because a terminated long distance code cannot be an "access device."

■ Brewer argues that his convictions on Counts 1 and 3 (for trafficking in counterfeit access devices) are inconsistent with his convictions on Counts 2 & 4 (for possessing unauthorized access devices) because "counterfeit" and "unauthorized" are mutually exclusive. Brewer contends that an access code is either counterfeit, which is totally forged or altered, or it is unauthorized, which is genuine but possessed without authority, but that it cannot be both. Brewer argues that the separate definitions for each term in section 1029(e) and the use of the disjunctive "or" in section 1029(a)(3), "devices which are counterfeit *or* unauthorized access devices," mean that Congress intended to create a dichotomy between the terms.

The argument is not without some force, but its difficulty is that even if Congress did intend to create a definitional dichotomy between the two terms, it does not necessarily follow that Brewer's conduct cannot fall within the meaning of both, and it did. The codes are both "counterfeit," because they are "fictitious" and "forged," and "unauthorized," since they were "obtained with intent to defraud." Congress need not have anticipated that technological advances would create the opportunity for conduct that meets both definitions.

4. *United States v. Griffin,* 589 F.2d 200, 207 (5th Cir.1979); *United States v. Ragen,* 314 U.S. 513, 524, 62 S.Ct. 374, 379, 86 L.Ed. 383 (1942) (on no construction can the statutory provisions here involved become a trap for those who act in good faith).

By the same token, we are unpersuaded by Brewer's broader argument that a legitimate access code cannot ever be "counterfeit." Brewer argues that the codes he obtained were genuine code numbers placed in the TNT computer and thus were not "counterfeit." However, an equally plausible interpretation is that Brewer did not "obtain" the codes from the computer but fabricated codes that just happened to be identical to the TNT codes. By analogy, someone who manufactures phony credit cards is no less a "counterfeiter" because he happens to give them numbers that match valid accounts.

Finally, Brewer argues that his conviction on Count 2, possessing 15 or more unauthorized access codes on October 27, is invalid because on that day he possessed only five working access codes. He contends that a terminated access code is not an access code that can be used to obtain anything of value as the statutory definition requires. The legislative history of the statute indicates that the requirement of possessing 15 codes was written into the statute to target major fraud operations. We are not persuaded that Congress intended the statute to require that each of those 15 code numbers be active. Such a requirement would serve as a disincentive to credit card or long distance companies immediately to invalidate stolen or lost numbers to protect themselves. More importantly, the argument fails to recognize that the definitional section of the statute contemplates the misuse of revoked or canceled access codes.[5]

Brewer's arguments are clever and are skillfully presented. Ultimately, however, we are persuaded that their adoption would frustrate Congressional purpose—and that purpose controls.

We AFFIRM.