**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**John K. BRADY, Defendant–Appellee.**

**No. 93–4085.**

United States Court of Appeals,
Tenth Circuit.

Dec. 21, 1993.

---

Joshua Silverman, Atty., Dept. of Justice, Washington, DC (Richard D. Parry, U.S. Atty., and Stanley H. Olsen, Asst. U.S. Atty., Salt Lake City, UT, with him on the brief), for plaintiff-appellant.

Rodney G. Snow (Anneli R. Smith and Steven G. Shapiro, with him on the brief) of Clyde, Pratt & Snow, Salt Lake City, UT, for defendant-appellee.

Before BALDOCK and McWILLIAMS, Circuit Judges, and SAFFELS, District Judge.*

BALDOCK, Circuit Judge.

The government appeals the district court's dismissal of a four count indictment against Defendant John K. Brady on the grounds that the indictment was insufficient as a matter of law. We have jurisdiction pursuant to 18 U.S.C. § 3731.

I.

Expert testimony below, as thoroughly summarized by the district court, *see United States v. Brady*, 820 F.Supp. 1346 (D.Utah 1993), established the following description of the operation of cellular telephones. Cellular telephone service is based upon a system of individual cellular telephone units, which have wireless radio transmission capabilities, operating among a series of geographic cells. Each geographic cell is served by a radio transmitter, and as the cellular telephone user moves from one cell to another, transmission of telephone calls are shifted from one transmitter to the other.

Cellular telephones are typically programmed with two identifying numbers. The mobile identification number ("MIN") is a ten digit number (usually the area code and telephone number) assigned to the customer's cellular telephone by the cellular carrier when the customer subscribes to that carrier's service. The electronic serial number ("ESN") is an eight digit number programmed onto an electronic chip by the tele-

---

* The Honorable Dale E. Saffels, Senior United States District Judge for the District of Kansas, sitting by designation.

phone manufacturer. When a telephone call is initiated, the cellular telephone unit transmits the MIN and ESN to the cellular system.

Another feature provided by cellular carriers allows a cellular telephone customer to "roam," placing calls from a geographic cell belonging to a carrier with whom they do not have an account. This feature allows a Salt Lake City customer, for example, to use his Salt Lake City cellular telephone to make a local or long distance call while in New York City. When a roaming customer places a call, his telephone transmits the MIN and ESN. The roaming carrier, *e.g.*, the New York City carrier, recognizes the MIN as belonging to another carrier, *e.g.*, the Salt Lake City carrier, but cannot instantly validate the call because the validation system does not allow instantaneous inter-carrier validation. Rather than delay service to the roaming customer, the roaming carrier accepts this first call from the roaming customer before it has had an opportunity to validate the MIN and ESN as a legitimate combination.[1] While the "first call" is taking place, a computer communicates with a central database of all legitimate MIN/ESN combinations. If the MIN/ESN combination does not match a valid combination in the home carrier's computers, subsequent calls using the same combination will not be allowed. Telephone calls attributed to "unmatched" MIN/ESN combinations are listed individually in the cellular carrier's billing computer, along with the charges associated with each individual call, but the user cannot be identified and the charges cannot be collected from him.

Cellular telephones can be altered by either replacing or reprogramming the microchip containing the unit's MIN and ESN. Telephones altered in this manner can be used either as "clones" or "free riders" to circumvent the normal cellular telephone system billing process. Cloning involves the programming of a cellular telephone so that the MIN/ESN combination is identical to a combination assigned to a legitimate customer. By cloning, the user accesses the legiti-

mate customer's account to obtain free telephone service until the legitimate customer recognizes and reports the unauthorized charges.

Free riding involves the use of "tumbling" cellular phones. Free riding is achieved when the microchip that holds the MIN and the ESN has been modified to allow the user to change or tumble the MIN/ESN combination in his telephone at will by programming and reprogramming the MIN, the ESN, or both, from the key pad. The user programs a random MIN/ESN combination into the unit and continues using it until the validation system determines that it is invalid and blocks further calls. In this way, the user free rides the cellular telephone system and takes advantage of the roamer service by continually making a series of unmatched first calls, without ever being charged for the calls.

## II.

On October 24, 1992, the grand jury returned an indictment charging Defendant with four counts of violating 18 U.S.C. § 1029(a)(1). Counts I through III alleged that Defendant, in pertinent part:

> knowingly, and with intent to defraud, trafficked in a counterfeit access device, as defined in 18 U.S.C. § 1029(e)(2); that is, an altered cellular telephone, permitting unauthorized access to telephone services, such conduct having an effect on interstate commerce, all in violation of 18 U.S.C. § 1029(a)(1).

Count IV alleged that Defendant, in pertinent part:

> knowingly, and with intent to defraud, used a counterfeit access device, as defined in 18 U.S.C. § 1029(e)(2); that is, an altered cellular telephone, permitting unauthorized access to telephone services, such conduct having an effect on interstate commerce, all in violation of 18 U.S.C. § 1029(a)(1).

Defendant moved to dismiss the indictment as insufficient, claiming that it failed to state an essential element of the offense, *i.e.*,

---

**1.** Depending on the length of the telephone call and the speed of the validation process, the caller

may be able to place more than one call before validation occurs.

that Defendant used or trafficked in an access device that gained access to a billed account. Defendant also moved to suppress statements he made during the course of the investigation and to dismiss the indictment based on the government's breach of an agreement not to prosecute. Following a three-day evidentiary hearing on Defendant's motions, Defendant filed a third motion to dismiss the indictment, this time based on insufficiency of the evidence.

At the hearing, the government presented evidence that Defendant used and trafficked in four tumbling Mitsubishi Series 800 cellular telephones. Testimony established that these telephones had been altered so that the caller could obtain telephone service by free riding the system. Defendant admitted at the hearing that he had used a tumbling cellular telephone to place some 1300 calls over several months; however, the government conceded that it could not prove that Defendant, or any of the four telephones associated with Defendant, actually accessed identifiable subscriber accounts.

The government's offer of proof concerning account access came from employees of Cellular One of Salt Lake City—one of two cellular telephone companies in Salt Lake. The employees testified that unmatched calls and the charges created by the calls are reflected in Cellular One's records. The employees further testified that these charges cannot be collected, resulting in Cellular One absorbing whatever costs are associated with such calls. The evidence indicated that Cellular One has an account with McCaw[2] and when unmatched calls are made on Cellular One's system, Cellular One must in turn make payment to McCaw for these calls. The evidence also indicated that Cellular One has accounts with various long distance carriers, and when unmatched long distance calls are made on Cellular One's system, Cellular One is obligated to pay the long distance carrier for the calls. Although the govern-

ment presented testimony from Cellular One employees, the government was unable to link any of the four phones associated with Defendant to any unmatched call in Cellular One's accounting records or in any other carrier's records.

The district court dismissed all counts against Defendant finding the indictment insufficient as a matter of law. The court dismissed Count IV with prejudice, reasoning that the government could not show that Defendant gained access to one or more identifiable accounts or establish a factual connection between any cellular telephone company losses and Defendant's alleged conduct. As a result, the court determined that the government was unable to establish an essential element of a violation of 18 U.S.C. § 1029(a)(1)—i.e., use of an access device. The court dismissed Counts I through III, the trafficking counts, without prejudice, allowing the government an opportunity to recharge Defendant if it is prepared to prove that Defendant transferred an altered cellular telephone with the intent that it serve as a clone.[3] The court did not rule on Defendant's motion to suppress, or his motion to dismiss based on the government's breach of agreement.

On appeal, the government claims that the district court erred in concluding that a tumbling cellular telephone, used or transferred to another for purposes of free riding on the telephone system, is not an "access device" within the meaning of 18 U.S.C. § 1029. We affirm.

### III.

■■ We judge the sufficiency of an indictment by (1) whether the indictment contains the elements of the offense and apprises the defendant of the charges he must meet, and (2) whether the defendant would be protected against double jeopardy by a judgment on the indictment. *United States*

---

2. The relationship between Cellular One and McCaw is unclear from the record. At one point, a Cellular One employee testified that Cellular One is a subsidiary of McCaw. The same witness then testified that Cellular One is a national corporation and that Cellular One and McCaw are the same corporation.

3. We make no comment as to whether a cloned cellular telephone—i.e., one with an MIN and ESN identical to another existing legitimate unit—would represent a means of account access within the ambit of § 1029.

*v. Brown,* 925 F.2d 1301, 1304 (10th Cir. 1991). A sufficient indictment is required to implement the Fifth Amendment guaranty that the defendant's conviction is based on facts presented to a grand jury. *United States v. Shelton,* 848 F.2d 1485, 1494 (10th Cir.1988). The sufficiency of an indictment is a question of law we review de novo. *U.S. v. Shelton,* 937 F.2d 140, 142 (5th Cir.1991), cert. denied, —— U.S. ——, 112 S.Ct. 607, 116 L.Ed.2d 630.[4]

Section 1029 makes it unlawful for anyone to "knowingly and with intent to defraud produce[ ], use[ ], or traffic[ ] in one or more counterfeit access devices." 18 U.S.C. § 1029(a)(1). Access device is defined as:

> any card, plate, code, account number, or *other means of account access* that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds other than a transfer originated solely by paper instrument.

*Id.* at § 1029(e)(1) (emphasis added). Section 1029 defines counterfeit access device as "any access device that is counterfeit, fictitious, altered, or forged, or an identifiable component of an access device or a counterfeit access device." *Id.* at § 1029(e)(2). The legislative history of § 1029 reveals that Congress enacted the statute out of concern over " 'fraudulent use of access devices in connection with credit transactions.' " *United States v. McNutt,* 908 F.2d 561, 563 (10th Cir.1990) (quoting *United States v. Blackmon,* 839 F.2d 900, 913–14 (2d Cir.1988)), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991). In this circuit, we have applied § 1029 to the unauthorized use of credit cards, *see United States v. Ryan,* 894 F.2d 355, 357 (10th Cir.1990), and to long distance telephone access codes, *see United*

*States v. Teehee,* 893 F.2d 271, 272 (10th Cir.1990). At the same time, we have held that § 1029 does not apply to electronic addresses of satellite television descramblers. *See McNutt,* 908 F.2d at 563–64.

In *McNutt,* we held that cloned electronic addresses on satellite television descrambler modules were not "access devices" within the meaning of § 1029. *Id.* The defendant in *McNutt* used a cloned descrambler to free ride satellite television transmissions. *Id.* at 563. We determined that § 1029 did not prohibit this activity because, although the operators of satellite television services suffered economic losses from the revenue forgone due to the use of cloned descrambler modules, use of such modules did not "debit legitimate subscribers' accounts[, and] no additional charges accrued as a result of the unauthorized use." *Id.* at 563–64. For purposes of § 1029, we defined an account as "a formal record of debits and credits." *Id.* at 563. The government argued in *McNutt* that the use of cloned descramblers was a means of account access because a legitimate fee-paying viewer provides the free ride. *Id.* We rejected this argument stating, "the government has mistaken economic losses for actual monetary losses." *Id.* We held that economic losses were not enough under § 1029; instead, the government must be able to connect actual losses to distinct transactions reflected in the company's accounting records. *Id.* Finally, we concluded that "nothing in the plain wording, legislative history or judicial interpretation of § 1029 [ ] lead[s] us to believe that Congress intended that statute to apply to anything other than direct accounting losses." *Id.* at 564.

■ In light of *McNutt,* we conclude that the cellular telephones at issue in this case— *i.e.,* altered cellular telephones used for pur-

---

**4.** While ordinarily the sufficiency of an indictment is judged solely on the face of the indictment, where both parties present evidence and raise no objection to the judge's consideration of the essential undisputed facts, "[i]t is permissible and may be desirable ... for the district court to examine the factual predicate for an indictment to determine whether the elements of the criminal charge can be shown sufficiently for a submissible case." *Brown,* 925 F.2d at 1304; *see also United States v. Wood,* 6 F.3d 692, 695 (10th

Cir.1993) (relying on undisputed fact outside of indictment in concluding indictment was insufficient).

In the instant case, the district court determined the insufficiency of the indictment from its face as well as from evidence presented at the evidentiary hearing. Because both parties presented evidence and neither has objected to the court's consideration of the undisputed facts, we note that the court's procedural handling of the case was appropriate.

poses of free riding on the cellular telephone system—are not "access devices" within the meaning of § 1029. The government's offer of proof fails to establish that the tumbling cellular telephones were a "means of account access" as required by § 1029(e)(1). Although the government argues that a tumbling cellular telephone is a means of account access because it is capable of accessing one cellular carrier's "account" with another carrier, we do not believe that this is the type of account access contemplated by § 1029.

Unlike the unauthorized use of credit cards or long distance telephone access codes, use of a tumbling cellular telephone, like the use of a cloned satellite television descrambler in *McNutt,* does not debit a legitimate subscriber's account, nor does it trigger the creation and maintenance of a formal record of credits and debits. *See id.* at 563. In support of its argument that access to a cellular telephone carrier's account with another carrier is a means of account access under § 1029, the government relies on *United States v. Taylor,* 945 F.2d 1050 (8th Cir.1991), and *United States v. Brewer,* 835 F.2d 550 (5th Cir.1987). However, these cases do not support, and our research reveals no other cases that support, the proposition that § 1029 applies to anything less than access to an identifiable account for which a record is created and maintained.[5]

In *Brewer,* the defendant obtained a number of unassigned long distance telephone access codes and used them to obtain free long distance service. 835 F.2d at 551. In *Taylor,* the defendant obtained an unassigned American Express account code enabling him to obtain over $6,500 in goods and services. 945 F.2d at 1051. In each case, although neither defendant accessed an established customer account, each defendant utilized an identifiable, valid account number, and transactions in which the account numbers were used were actually identified in connection with specific accounts. The accounts accessed by the defendants in *Brewer* and *Taylor* were legitimate in that the companies involved had created the account numbers for future assignment, and each transaction entered into by the defendants appeared in the record actually created and maintained for that particular account. In the instant case, on the other hand, Defendant never accessed a valid account; rather he continually used MIN/ESN combinations that were *invalid* and therefore, he was unable to access either a previously assigned or yet unassigned valid account.[6]

Moreover, the cellular telephone carrier's "account" with other carriers that the government asserts Defendant accessed in violation of § 1029 is no more than a list of unmatched telephone calls, which are not billable because they cannot be attributed to a legitimate subscriber's account. That these lists of unmatched calls result in charges between and among cellular and long distance carriers does not mean that the placement of an unmatched call accesses an account under § 1029. Rather, the lists of unmatched calls represent a method by which the costs of system usage is allocated between and among different cellular and long distance carriers. As the district court concluded below, these lists of unmatched calls merely reflect that users of tumbling cellular telephones have been able to access the cellular carrier's *system,* not the type of distinct identifiable accounts required by § 1029.[7]

---

5. The only other court to address the precise issue of tumbling cellular telephones and § 1029 concluded that the microchips installed in the cellular telephones to allow the user to free ride were not access devices under § 1029. *See United States v. Bailey,* No. CR–91–59 (C.D.Cal. Nov. 10, 1992), *appeal docketed,* No. 92–50721 (9th Cir. Dec. 4, 1992).

6. While it is conceivable for a tumbling cellular telephone to chance upon a MIN/ESN combination that has been assigned to a legitimate customer, the government's case against Defendant relied solely on Defendant's use of MIN/ESN combinations that resulted in unmatched calls.

7. We note that the government's proffer of evidence would also fail under *McNutt* for failure to attribute any direct accounting losses to Defendant's conduct. *See McNutt,* 908 F.2d at 564. While the losses to the cellular telephone carriers are somewhat more tangible than the purely economic losses in *McNutt,* the government is simply unable to establish any factual connection between the four tumbling cellular telephones associated with Defendant and any cellular carrier losses. The government cannot establish any

In summary, we conclude that, similar to the situation in *McNutt*, § 1029 cannot be extended to apply to tumbling cellular telephones used for purposes of free riding on the cellular telephone system when the government is unable to show that the telephone accessed an identifiable account. The plain language of § 1029, together with our interpretation of § 1029 in *McNutt*, informs us that in order to fall within § 1029's definition of access device, the government must be able to establish access to a valid identifiable account for which a record of debits and credits is created and maintained, and which results in direct accounting losses. We believe that to hold otherwise would turn § 1029 into a general theft statute applicable whenever a company can document a loss through fraud. Such a broad interpretation of § 1029 is neither supported by the language of the statute nor its legislative history. *See* H.R.Rep. 894, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.C.C.A.N. 3182, 3689 (Congress seeking to address "the growing problem in ... unauthorized use of account numbers or access codes"). Although Congress, without question, has the power to criminalize the use of or trafficking in cellular telephones altered to allow free riding on the cellular telephone system, even when such telephones do not access valid identifiable accounts, Congress did not do so when it enacted § 1029.

The indictment against Defendant does not contain one of the necessary elements of a violation of § 1029—*i.e.*, that Defendant used or trafficked in an access device. As a result, the indictment in this case is insufficient, *see Brown*, 925 F.2d at 1304 (indictment must contain all elements of offense), and we AFFIRM the district court's dismissal of all counts.

connection between Defendant and Cellular One, much less a connection between Defendant and any of the unmatched calls reflected in Cellular One's records.