85 F.3d 629
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES Of America, Plaintiff-Appellee,
v.
Freemont BEAN III, Russell Alan Brown, Philip Munson, and
Ralph G. Lopez, Defendants-Appellants.
 Nos. 95-1262, 95-1263, 95-1264 and 95-1282.
 United States Court of Appeals, Sixth Circuit.
 May 2, 1996.
 
 Before: KRUPANSKY, RYAN and NORRIS, Circuit Judges.
 PER CURIAM.
 
 
 1
 The defendants-appellants Freemont Bean III, Russell Alan Brown, Philip Munson, and Ralph G. Lopez have each contested his respective sentence imposed by the district court following his trial and conviction by a jury for conspiracy to commit wire fraud and for substantive wire fraud counts. Bean, Munson, and Lopez each have challenged the lower court's assignment of a two-point "vulnerable victim" enhancement to his base offense level under U.S.S.G. § 3A1.1(b) for targeting elderly marks. Bean, Brown, and Lopez each have disputed the sentencing court's calculation of the sum of money swindled from targets (the "fraud loss") chargeable against him. Brown alone has asserted that the district court engaged in impermissible "double counting" by augmenting his offense level for both (1) the total amount of the conspiratorial fraud losses generated during his participation in the criminal enterprise and (2) for exploiting multiple victims.
 
 
 2
 The defendants-appellants had each participated in a grand-scale telemarketing fraud conducted under the name "Corporate Claims Advertising" ("CCA"). Each appellant had been stationed in the CCA headquarters situated in Kalamazoo, Michigan, although the scheme had further spawned branch offices in a number of American cities located outside of Michigan. The CCA modus operandi entailed the purchase of telemarketing telephone numbers and "leads" from companies engaged in the business of supplying such information. By design, the lead lists selected by CCA targeted persons aged 60 or over. The potential target would be telephoned by a CCA "dialer." If the call was answered, the dialer advised that a follow-up call was immediately forthcoming. The dialer would then deposit a "lead slip," bearing the target's name, telephone number, and other pertinent information, into a central basket. A "front salesman" or "fronter" would then retrieve a lead slip from the basket, telephone the target, and deliver a standardized sales "pitch" (which included expressed and implied misrepresentations) designed to persuade the listener to purchase products from CCA at highly inflated prices through the artifice of a phony advertising promotion.
 
 
 3
 The fronter would represent that the mark had been awarded a major prize in a CCA promotional contest. The target would be advised that he or she was guaranteed to win one of five allegedly major awards determined by a random drawing. The specific prize list varied but always included some type of vehicle as the top award, two or three additional costly items or cash, and one or two ostensibly pricey but in fact cheap articles generally valued in the $35 to $50 range (the latter of which were denoted "gimmie gifts" in CCA conspiratorial nomenclature). The fronter would misrepresent that a $2,500 cash prize was the "bottom award" to dupe the mark into believing that the "gimmie gift(s)" which appeared on the list were more valuable than represented. The pitch then instructed the victim that, as a condition for receiving the purported fantastic prize, he or she was required to purchase from CCA a designated product, such as a water purifier, air purifier, energy saver, vitamins, or beauty products, at an inflated price quoted by the fronter. The quoted price would range between $350 and $1,000. The precise sales figure quoted was contingent upon the salesman's assessment of the mark's vulnerability and ability to pay. Receptive targets would be instructed to execute a check payable to CCA and arrange for its immediate delivery by Federal Express to the CCA headquarters. Prior to closing the transaction, a CCA "verifier" would telephone the victim to obtain a recorded disclaimer from the purchaser that would attest, inter alia, that no representations had been made concerning the value of any prize or the identity of the prize to be awarded.
 
 
 4
 After the mark's check had cleared his or her bank, CCA would deliver the purchased product, together with a "Certificate of Award" bearing a code number, to the target. Approximately thirty days later, a CCA "reloader" would telephone the dupe and identify the purportedly computer-selected prize awarded to that person. In fact, no computer selection had been made and the entire conversation was a charade; the prize awarded was always a stock item inexpensive "gimmie gift." The reloader would then "sizzle" the "gimmie gift" (expressly and impliedly exaggerate the value of the prize) and would announce that the victim had been automatically entered in an even bigger contest which would require, as a condition for participation, the purchase of a product at an inflated quoted price in the thousands of dollars which product had an actual value of only several hundred dollars. The reloaders would sometimes assert that the "contestant" was "almost there" and stood on the brink of winning a major prize in the immediate future if he or she would continue participation in the "contests." This bait process would be repeated in thirty day cycles until the mark was dried out. Through these predatory methods, CCA operatives (including the defendants) cheated thousands of mostly elderly trusting persons out of over $5.2 million between CCA's February 1991 inception and a police raid conducted in March 1993 which terminated the flim flam operation.
 
 
 5
 Three of the appellants presently charge that the district court erred by imposing a two-point enhancement to their respective base offense levels under U.S.S.G. § 3A1.1(b) for targeting unusually vulnerable victims. To impose this sentencing augmentation, the trial court must find by a preponderance of the evidence that the accused had intentionally selected victims because of their vulnerability. The standard for reviewing such a finding is for clear error. United States v. Smith, 39 F.3d 119, 122-24 (6th Cir.1994). While advanced age certainly does not constitute a per se disability in every case or in all contexts, it may render some persons more susceptible to scam than a younger individual, for numerous reasons including, but not limited to, impaired hearing, decreased energy and failing mental alertness and/or memory, failing comprehension, a sense of loneliness or boredom, and a desire to "invest" money to ensure post-retirement security. The elderly are also more desirable targets because they are less prone to create controversy, and as a class generally possess more savings and other assets than most younger persons. Senior citizens are more assailable because they are more likely to be at home at the time of a call to listen to the pitch.
 
 
 6
 The evidence, including the uncontradicted direct testimony of several CCA operatives, disclosed that most of the defrauded "contestants" in fact were elderly and that at least some suffered from identifiable disabilities which rendered them unusually susceptible to manipulation and deception. Moreover, the evidence reflected that CCA intentionally preyed upon those persons because its principals and agents believed that they were exceptionally malleable. The evidence was sufficient to justify the imposition of two-point base offense level increases.
 
 
 7
 Bean and Lopez have averred that, instead of charging them with the total sum of the fraudulently exacted income realized by the CCA office in Kalamazoo during the terms of their respective employments, the district court should have relied only upon the amount of money that each of their personal efforts contributed to the Kalamazoo income.[1] The amount of victims' losses attributable to the fraud chargeable to a defendant for sentencing purposes is a question of fact reviewed for clear error. United States v. Moored, 38 F.3d 1419, 1423 (6th Cir.1994). Coconspirators are accountable for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity[.]" U.S.S.G. § 1B1.3(a)(1)(B). In the case sub judice, the trial evidence reflected an ongoing team involvement by all conspirators at the Kalamazoo office designed to maximize the loot from the bunco operation, and accordingly no clear error inhered in the trial court's imputation to the appellants of the aggregate thefts effected by Kalamazoo office personnel during pertinent periods. See United States v. Hall, 996 F.2d 284, 285-86 (11th Cir.1993) (per curiam ).
 
 
 8
 This appellate review has also considered appellants' charge that the trial court erroneously applied a deduction factor of 20% rather than 45% in calculating the salesmen's costs attributable to merchandise and gifts (the "pad") delivered to targets to promote the scam, and/or neglected to subtract the value of bad or cancelled checks, refunds, and other alleged deductions from CCA revenues. These issues were not properly presented in the trial court and consequently this reviewing court declines consideration of them.
 
 
 9
 In any event, in fraud cases, the sentencing judge exercises discretion in determining the method to compute losses attributable to fraudulent activity, and reasonable estimates are acceptable. U.S.S.G. § F1.1, comment. (n. 8); United States v. Ashe, 47 F.3d 770, 776 (6th Cir.), cert. denied sub nom. Daughtrey v. United States, --- U.S. ----, 116 S.Ct. 166 (1995). The trial court's method of calculating a fraud loss is reviewed for clear error. Ashe, id. at 776. It was not clear error for the trial court to deduct a 20% "pad" from the revenue figure culled from CCA's own financial statement because no credible evidence was proffered to support the 45% deduction urged by Brown. The weight of the evidence supported the 20% deduction figure adopted by the lower court.
 
 
 10
 Finally, Brown has argued that the district court misapplied the Sentencing Guidelines by both (1) elevating his base offense level by two points for injuring multiple victims under U.S.S.G. § 2F1.1(b)(2)(B) and (2) raising his offense level by 12 additional levels pursuant to U.S.S.G. § 2F1.1(b)(1)(M) for the amount of the aggregate conspiratorial fraud loss suffered by all victims of the Kalamazoo office during his involvement with the operation. Brown reasons that the fact of multiple victims was subsumed in the aggregation of conspiratorial revenues which had been exacted from multiple victims. This question of Guidelines application is reviewed de novo. United States v. Smith, 39 F.3d 119, 122 (6th Cir.1994).
 
 
 11
 Unfortunately, Brown's contention is misconceived. The Sentencing Commission designed the two provisions at issue to punish two separate wrongs--(1) participation in the causing of a significant amount of fraud losses, § 2F1.1(b)(1); and (2) the exploitation of more than one victim, § 2F1.1(b)(2)(B). The Commission embodied these factors in distinct segments of the Guideline because they address diverse transgressions. Obviously, a criminal could dupe $1.5 million from a single individual, thus triggering § 2F1.1(b)(1)(M), but not § 2F1.1(b)(2)(B). Only if the additional act of exploiting more than one human being was involved would the latter section be activated, as in the case at bench, in which thousands of people were victimized. The drafters of section 2F1.1(b) manifestly intended that a separate enhancement for gouging multiple victims should be added to an independent enhancement for chiseling a large sum of money (which happened to be extracted from more than one mark). See U.S.S.G. § 1B1.1, comment. (n. 4); accord, United States v. Muhammad, 948 F.2d 1449, 1458 (6th Cir.1991), cert. denied, 502 U.S. 1119, 112 S.Ct. 1239 (1992).
 
 
 12
 Accordingly, no clear error of fact or misapplication of law infected the sentencing of any of these appellants, and, consequently, their sentences are each hereby AFFIRMED.
 
 
 
 [1]
 The trial court declined to predicate the sentences of the defendants upon the total income realized by all CCA offices during the relevant periods, as urged by the prosecution