[No. B091593. Second Dist., Div. Four. Mar. 26, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDRE MAURICE BUTLER, Defendant and Appellant.

## COUNSEL

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, John R. Gorey, Jaime L. Fuster and Mitchell Keiter, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RUBIN, J.***—This case affords us the opportunity to examine the fascinating and often uncertain relationship between law and technology. While courts must be sufficiently receptive to the notion of adapting legal principles to address societal changes brought upon by new technologies, where, as here, the issue involves an interpretation of existing statutes, we must maintain our usual deference to the Legislature in such matters and ask ourselves first how that body would have handled the problem if it had anticipated it. (*Lewis* v. *Ryan* (1976) 64 Cal.App.3d 330, 333 [134 Cal.Rptr. 355].)

Here we are presented with the question of whether the possession of an unlawfully cloned cellular phone constitutes a violation of the access card law. (Pen. Code, § 484d et seq.) After due analysis of the act, the legislative history and analogous federal authorities, we conclude that possession of such a device falls within the access card law and that the Legislature did not intend to bar prosecution under that law by its enactment of a telephone fraud law. For this reason, and because defendant's other arguments on appeal are without merit except for an error in sentencing, we modify part of the sentence and affirm.

### I.

### *Procedural History*

Defendant Andre Maurice Butler (defendant) was convicted of two felony counts of receipt of an access card with the intent to defraud (Pen. Code, § 484e, subd. (c)) and two misdemeanor counts of possession of an instrument with the intent to avoid a lawful telephone charge (Pen. Code, § 502.7, subd. (b)(1)).[1] The criminal charges all arose out of his possession of two cloned cellular phones. A cloned cellular phone is one that is unlawfully

---

*Judge of the Municipal Court for the Santa Monica Judicial District sitting under assignment by the Chairperson of the Judicial Council.

[1] Penal Code section 484e, subdivision (c) provides: "Every person who sells, transfers, conveys, or receives an access card with the intent to defraud, or who acquires an access card with the intent to use it fraudulently, is guilty of grand theft."

Penal Code section 484d, subdivision (2) defines an "access card" as "any card, plate, code, account number, or other means of account access that can be used, alone or in conjunction with another access card, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds, other than a transfer originated solely by a paper instrument."

Penal Code section 502.7, subdivision (b)(1) provides: "(b) Any person who does either of the following is guilty of a misdemeanor or a felony, except as provided in subdivision (g): [¶] (1) Makes, possesses, sells, gives, or otherwise transfers to another, or offers or advertises

programmed with electronic identification numbers assigned not to the cloned phone but to another cellular phone. When a telephone call is placed from a cloned phone, the call is charged to the account of the person who is lawfully assigned the electronic identification numbers. (See discussion, *post.*)

Defendant also admitted a 1978 prior conviction for robbery. He was sentenced to the middle term of two years in state prison for counts 1 and 2 (the two access card charges) and one year in the county jail for the two misdemeanor charges. The sentence on count 1 was doubled to four years because of the second strike prior conviction. (§ 667, subds. (b)-(i).) The sentences for the remaining counts were imposed to run concurrently with count 1.

Defendant's principal contention on appeal is that he was unlawfully convicted of the two felony access card counts because as a matter of law cellular telephones do not constitute access cards within the Penal Code's definition of that term. Even if cellular phones are access cards, since the Legislature adopted an entirely separate statutory scheme for telephone fraud in section 502.7, defendant argues he can be prosecuted only under that more specific statute and not the general statute, section 484e, subdivision (c). Defendant also contends that the court failed to instruct sua sponte on section 484e, subdivision (a), a lesser included misdemeanor. Finally, defendant makes a multifaceted attack on the three strikes law under which he was sentenced and contends that the trial court should have stayed the sentences on counts 2, 3 and 4 rather than imposing concurrent sentences.

## II.

### *Factual Summary*

Viewed in the light most favorable to the judgment (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence established that on November 16, 1994, defendant was in Inglewood in the vicinity of a laundromat when he became engaged in an argument with the store's proprietor. During the disturbance, defendant threatened the shop owner and then made a call on a cellular phone which he removed from his pocket. The owner said he was going to call the police; defendant responded that he would do likewise. Whereupon, he removed a second cellular phone from his pocket and began dialing that phone.

---

any instrument, apparatus, or device with intent to use it or with knowledge or reason to believe it is intended to be used to avoid any lawful telephone or telegraph toll charge or to conceal the existence or place of origin or destination of any telephone or telegraph message."

All further statutory references are to the Penal Code unless otherwise indicated.

Shortly thereafter, the police arrived on the scene and saw defendant acting in an agitated manner moving a cellular phone from ear to ear by changing hands. After conducting an investigation, the police effected a citizen's arrest for disturbing the peace. Defendant was taken into custody.

When defendant was at the jail, the booking officer took the two phones from him and booked them with defendant's property. While the officer was examining the phones, he noticed that one of them was missing an external tag containing the phone's serial number. The officer also thought it was odd that someone would have two cellular phones in his possession. His suspicions were partially aroused because of a recent briefing he had attended on cloned cellular phones. He called fellow officer Paul Harvey, a detective with expertise with cloned telephones.

Detective Harvey looked at the two phones and determined that the internal electronic serial number (ESN) and mobile identification number (MIN) programmed into each phone did not match the phone, and that the two phones were clones. Detective Harvey advised the booking officer to add telephone cloning charges against defendant.

After waiving his *Miranda* rights, defendant told Detective Harvey that he was delivering the two phones to a person in Inglewood from a cloner in the San Fernando Valley. He offered to reveal the source of the altered phones if he could make a "deal." Detective Harvey demurred. A few days later defendant telephoned Detective Harvey, said he did not like the deal that he had been offered (presumably by the prosecutor), and would tell the cloner that the police were aware of the operation.

At trial, an employee of Air Touch Cellular explained how a cellular phone is cloned. When a legitimate subscriber purchases a telephone, he or she must open an account with the cellular provider. The account is then linked to two distinct numbers, unavailable to anyone else. The first number, the MIN, is the number which is referred to commonly as the phone number, a 10-digit number with an area code and a personal number. It is programmed into the software of the cellular phone. The second number, the ESN, is a special serial number also programmed into the phone.

Combinations of linked ESN's and MIN's are obtained illegally either through sophisticated scanning devices which electronically pull them from airwaves while a lawful subscriber is using his or her phone, or from unscrupulous telephone company employees. The ESN/MIN combinations are then sold to cloners who use special computer software to reprogram those numbers into other cellular phones. A single ESN/MIN combination

can be used to program more than one phone. When telephone calls are placed on cloned phones, the legitimate subscriber is billed for the call along with the calls which the subscriber has placed lawfully on his or her own cellular phone.

The Air Touch Cellular witness identified the lawful subscribers for the ESN/MIN numbers on the two phones in defendant's possession and explained the ESN's did not correspond to the manufacturers of those phones. The telephone bills on the subscribers' accounts disclosed that several calls were made to the telephone number belonging to defendant's wife. The calls were placed on November 14, 15 and 16 (the day of defendant's arrest). There was no evidence that the lawful subscribers knew defendant or his wife.

### III.

*Defendant Was Properly Convicted Under Section 484e, Subdivision (c)*

A. *The Statutory Scheme*

 Defendant's principal contention on appeal is that he could be convicted only of section 502.7, subdivision (b)(1), telephone fraud, and not section 484e, subdivision (c), access card fraud. The importance of this argument is that defendant was charged and convicted of section 484e, subdivision (c) as a felony and of section 502.7 as a misdemeanor.

We begin our analysis with an overview of the two statutes.

Sections 484d through 484j comprise a comprehensive statutory scheme which punishes a variety of fraudulent practices involving access cards. "Access card" is defined broadly to include: "any card, plate, code, account number, *or other means of account access* that can be used, alone or in conjunction with another access card, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds, other than a transfer originated solely by a paper instrument." (§ 484d, subd. (2), italics added.) Although the term itself uses the word "card," its definition is broad in scope and covers intangible information as well as tangible objects. The term "access card" is found in every other part of the statutory scheme, and it is unlawful activity associated with an access card that triggers criminal prosecution under the various statutes. (§ 484e et seq.)[2]

Under section 484e, subdivisions (a) and (b), one who acquires an access card without the consent of the cardholder or issuer, or who finds a lost card,

---

[2]Section 484d defines several other terms used in the ensuing statutes. With one exception not relevant here, each of those defined terms includes a reference to "access card."

and possesses the card with the intent to use, sell or transfer it, is guilty of *petty* theft. Under subdivision (c), the charge of which defendant was convicted, one who sells, transfers, conveys or receives an access card with the intent to defraud is guilty of *grand* theft. The principal but not sole distinction between section 484e, subdivisions (a) and (b), on the one hand, and section 484e, subdivision (c), on the other, is that the latter requires an intent to defraud.

Under section 484e, subdivision (d), receipt of access cards issued to four or more persons under circumstances indicating that the cards were taken in violation of subdivision (a), (b) or (c) constitutes grand theft. Under subdivision (e) one who acquires information pertaining to another's access card account without consent and with the intent to defraud is also guilty of grand theft.

Section 484f punishes as forgery the use of a counterfeit access card, the signing of another's name as part of an access card transaction, and the alteration of access card account information encoded on a magnetic strip or comparable nonreadable medium. Section 484g punishes as theft the obtaining of anything of value by the use of an access card or account information obtained in violation of section 484e or 484f, or by the use of a forged, expired or revoked access card, or by the making of false representations as to the true ownership or validity of an access card.

Section 484h punishes certain retailer practices in connection with the improper use of access cards. Section 484i makes it unlawful to possess or design an incomplete card or certain card making equipment. Section 484j makes it unlawful to publish access cards, codes, passwords or similar information with the intent to defraud.

In contrast to the broad language of section 484d et seq., section 502.7 specifically addresses fraudulent practices in obtaining telephone and telegraph services. Subdivision (a) makes it illegal to avoid a lawful charge for telephone service if, with the intent to defraud, a person (1) charges service to an existing telephone number or credit card number without authority; (2) charges service to a nonexistent or suspended telephone or a revoked or canceled credit card; (3) uses a "code, prearranged scheme, or other similar stratagem or device" to send or receive information; (4) rearranges or tampers with telephone service either physically, electronically or by other means; or (5) uses any other deceptive practice including the fraudulent use of false, altered or stolen identification. Subdivision (b)(1), of which defendant was convicted, makes it illegal to make, possess, sell or transfer any instrument, apparatus or device with the intent to use it or with knowledge or reason to believe it is intended to be used to avoid a lawful telephone charge.

Section 502.7, subdivision (b)(2) makes it unlawful to sell or transfer any plans or instructions for making or assembling any device described in subdivision (b)(1).

Section 502.7, subdivision (c) makes it unlawful to publish the number or code of an existing or canceled credit card, or the coding for such card, with the intent that it be used to avoid a lawful charge. Subdivision (d) punishes persons who are lawfully issued a calling card, credit card or other means for using telephonic services and who receive consideration for allowing others to obtain telephonic services fraudulently. Subdivisions (e) through (j) deal with jurisdictional issues, punishment, restitution, and seizure and forfeiture of unlawful devices.

Neither section 484d et seq. nor section 502.7 mentions cellular phones.

## B. *The Legislative History of Section 484d et seq.*

Defendant contends that the plain meaning of the statute itself and a review of the historical legislative materials demonstrates that the Legislature did not intend prosecution for cellular telephone fraud to come within the ambit of section 484d et seq. Therefore, the trial court should have dismissed the two section 484e, subdivision (c) charges against him. No reported case has construed section 484d, subdivision (2)'s definition of "access card" or considered the application of cellular phones to the statute. We look, therefore, to relevant legislative intent.

We are guided on this journey by some familiar principles. ██ We consider first the language of the statute. (*People* v. *Carron* (1995) 37 Cal.App.4th 1230, 1236 [44 Cal.Rptr.2d 328].) "We look first to the words of the statute itself, which should be the best indicator of the lawmakers' intent. [Citation.] If those words are clear and unambiguous, we may not modify them to accomplish a purpose not apparent on the face of the statute or from its legislative history. [Citation.]" (*People* v. *Goodloe* (1995) 37 Cal.App.4th 485, 490-491 [44 Cal.Rptr.2d 15].)

██ As we have observed, section 484d, the definition statute, makes no mention of cellular or other telephones, nor is the subject mentioned in section 484e, subdivision (c) of which defendant was convicted, nor is there mention of telephones in any of the statutes in the section 484d series. One could reason that, since a telephone is not an access card in the everyday meaning of the term, the Legislature intended to exclude telephones. The statute does not expressly exclude telephones from its coverage. More importantly, from the face of the statute it is clear that the Legislature did not

intend the word "card" to have its colloquial meaning of "a flat stiff piece of paper or thin paperboard suitable for writing or printing, typically small and rectangular, and carrying . . . a record . . . ." (Webster's New Internat. Dict. (3d ed. 1981) p. 337.) A significant part of the statutory description of "access card" includes matters which are not within the common definition of "card." Specifically, access card includes a "code, account number, or other means of account access"; these are terms describing intangible property not three dimensional objects.

This observation does not, however, compel the conclusion that cellular phones with their programmed account information (i.e., ESN's and MIN's) are necessarily access cards. It does cause us to conclude that an answer to the definitional question will not come from the words of the statute itself. We then must look elsewhere for clues to what the Legislature intended by "access card." ■ While there are many approaches to ascertaining legislative intent (see *People* v. *Carron, supra,* 37 Cal.App.4th at p. 1236), ultimately our task is to "search for the manner in which the Legislature would have treated the problem in the case at bench had the Legislature foreseen it." (*Lewis* v. *Ryan, supra,* 64 Cal.App.3d at p. 333.) This is a particularly apt formulation of the standard in cases of emerging technology lest our laws be interpreted only in light of yesterday's accomplishments. Although there are other tools for divining legislative intent, legislative history is "controlling upon us where clues to the legislative intent exist." (*Id.* at p. 334.) We turn to that legislative history.

■ Section 484d et seq. was derived from repealed section 484a. (Stats. 1961, ch. 813, § 1, pp. 2090-2091.) Section 484a made it illegal to engage in certain unauthorized practices with "credit cards." It defined credit card as "any instrument, whether in the form of a card, booklet, plastic or metal substance, or the number or other identifying description thereof" issued by a business or financial organization for obtaining on credit "goods, property, services, or anything of value." (*Ibid.*) Section 484a was repealed and replaced with section 484d et seq. in 1967. (See 49 West's Ann. Pen. Code (1988 ed.) § 484a, p. 166; *id.,* § 484d, p. 169.) The new law expanded the conduct made criminal, but kept, with modification, the term "credit card" as its defining element. The statute was amended four more times until 1986 when "access card" and its present definition replaced "credit card." (Stats. 1986, ch. 1436, § 1, p. 5136.)[3]

Defendant correctly points out that one of the moving forces behind the 1986 amendments was the banking industry's concern that there was significant debit card, as opposed to credit card, fraud accomplished by, for

---

[3]The term "or other means of account access" first appeared in a 1985 amendment to section 484, subdivision (d)(2). (Stats. 1985, ch. 367, § 2, p. 1524.)

example, fraudulent automatic teller machine (ATM) practices. Senate Bill No. 2392 was the legislation which modified section 484d to refer to access cards, redefined those cards, and made other changes to the related statutes. (Stats. 1986, ch. 1436, § 1, p. 5136; see Sen. Final History, 1985-1986 Reg. Sess. at p. 1519.) Senate Bill No. 2392 was introduced with the bankers' concerns in mind. "The purpose of this bill is to expand coverage of the statutes making fraudulent use of credit cards a crime to also cover debit cards, such as ATM cards and cards used at the point of sale." (Sen. Rules Com. on Sen. Bill No. 2392 (1985-1986 Reg. Sess.), 3d reading, as amended Apr. 24, 1986, p. 2; see also Sen. Com. on Judiciary, Rep. on Sen. Bill No. 2392 (1985-1986 Reg. Sess.), as introduced, pp. 2-3 (the Judiciary Committee Report).)

Although one legislative purpose in enacting Senate Bill No. 2392 was to address the growing ATM fraud problem, it was not the only purpose. From the very first Senate Judiciary Committee Report on the bill, it is apparent the Legislature intended to bring California law into conformity with newly enacted federal legislation on the subject. The report states in part: "Also, the words 'access card' replace[] 'credit card' throughout the section which this bill amends. According to the sponsor these change[s] are part of its overall intent to 'amend California statutes generally corresponding with federal legislation enacted in 1984 (Public Law No. 98-473)'." (Judiciary Com. Rep., *supra*, at p. 5; see also Sen. Com. on Judiciary, Rep. on Sen. Bill No. 2392 (1985-1986 Reg. Sess.), as amended Apr. 24, 1986, pp. 4-5.)

The quoted language in the Judiciary Committee Report was from a letter submitted to the chair of the Senate Judiciary Committee by the California Bankers Association, the bill's sponsor. (See Judiciary Com. Rep., *supra*, p. 2.) The letter states in part: "*SB 2392* would amend California statutes generally corresponding with federal legislation enacted in 1984 (Public Law No. 98-473). The federal statute, codified at 18 U.S.C. Section 1029 *et seq.*, covers all 'access devices' which are defined similarly in this bill as 'access cards'."[4] (Letter from James A. Clark to Sen. Bill Lockyer, Chairman, Sen. Judiciary Com., Apr. 10, 1986, p. 1.) The letter concludes: "The changes proposed in *SB 2392* will enable state and local law enforcement agencies, as well as federal authorities, to prosecute these crimes." (*Id.* at p. 2.) A similar statement is found in a letter from the California League of Savings Institutions to the Senate Judiciary Committee, which defendant has submitted to us. It states in part: "This effort to bring California law into line with federal provisions governing 'access cards' is necessary in order to permit prosecution of such crimes in state, as well as federal, courts." (Letter from David Milton to Sen. Bill Lockyer, Chairman, Sen. Judiciary Com.,

---

[4]The definitions of "access device" under federal law as it existed in 1986 and "access card" in Senate Bill No. 2392 are identical, except for a missing "a." (See text, *post*.)

Apr. 14, 1986.) Senator Keene, the bill's author, in his letter to Governor Deukmejian requesting signature on Senate Bill No. 2392, also expressed the view that the bill brought "California statutes into line with federal legislation." (Letter from Barry Keene to Governor George Deukmejian, Sept. 3, 1986.)

Because conformity with federal law was a major purpose in enacting section 484d et seq., we review applicable federal legislation on the subject of access device fraud for guidance in determining whether possession of cloned cellular telephones violates California's access card law.

## C. *Federal Law*

The 1984 federal law to which the Legislature referred in passing the 1986 amendments was codified at 18 United States Code section 1029. That law makes illegal certain conduct pertaining to "access devices." As enacted in 1984 and in effect in 1986, access device was defined as "any card, plate, code, account number, . . . or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument)." (18 U.S.C. § 1029(e)(1).) Although federal law uses the term "device," at the time it defined that term with the same words used to define "access card" in section 484d.[5]

Substantively, the federal statute in force in 1986 prohibited the same type of activity with "access devices" that state law prohibits with "access cards." For example, it made illegal the production, use or trafficking in counterfeit or unauthorized access cards (18 U.S.C. § 1029(a)(1), (2)); the possession of 15 or more counterfeit or unauthorized access devices (18 U.S.C. § 1029(a)(3)); the production, use or trafficking in device-making equipment (18 U.S.C. § 1029(a)(4)); and engaging in transactions with access devices issued to another person (18 U.S.C. § 1029(a)(5)). Each of the provisions required the defendant to have acted knowingly and with the intent to defraud. Other sections dealt with jurisdictional and punishment matters. (See 18 U.S.C. § 1029(b), (d), & (e).)

In the version of the statute in effect in 1986, there was no reference to cellular or other telephones.[6]

As earlier noted, there is no California appellate authority on the application of section 484d et seq., to cellular phones. In contrast, a number of

---

[5]See footnote 3, *ante.*

[6]In 1994, in response to inconsistent decisions of the circuit courts of appeals dealing with cellular phone "free riding," Congress amended 18 United States Code section 1029(e)(1) to include "electronic serial number, mobile identification number, personal identification num-

federal courts have considered the issue of fraudulently obtaining telephone services under the federal access device law. The first two cases to discuss the subject addressed not cellular phone fraud but the unlawful use of long distance access codes. In *U.S.* v. *Brewer* (5th Cir. 1987) 835 F.2d 550, the defendant had placed calls to a long distance carrier's toll free number and then, trying various combinations of personal access codes, was able to gain entry to the carrier's computer, receive a dial tone, and place a long distance phone call. The process was repeated numerous times and the calls were billed to unsuspecting customers of the carrier. (835 F.2d at pp. 551-552.) The defendant made a record of the access codes and offered to sell 17 of them to an undercover agent.

The defendant was prosecuted under 18 United States Code section 1029(a)(1) and (a)(3). He argued that the federal statute, a credit card law, did not reach the misuse of telephone access codes. In affirming the conviction, the Fifth Circuit stated: "Although its legislative history suggests that the primary focus of section 1029 was to fill cracks in the criminal law targeted at credit card abuse, we are persuaded that Brewer's conduct is reached by a practical reading of the statute. Both the Senate and House reports on the statute state that definition of 'access device' was intended to be 'broad enough to encompass technological advances.' Both reports also make specific reference to personal identification codes such as those used to obtain cash from automatic teller machines. Thus, although apparently this is the first case to do so, we need not stretch to read long distance access codes into the section 1029 definition of 'access device.'" (835 F.2d at p. 553, fns. omitted.)

The decision in *Brewer* was followed by *U.S.* v. *Teehee* (10th Cir. 1990) 893 F.2d 271. *Teehee* also involved unlawful use of long distance access codes. Defendant's conviction under 18 United States Code section 1029(a)(2) for trafficking in telephone access codes was affirmed.

The first decision upholding a conviction for use or possession of a cloned telephone came three years later in *U.S.* v. *Ahmad* (7th Cir. 1993) 2 F.3d 245, 246. There, the Seventh Circuit described the proceedings in the trial court as follows: "Ahmad pirated telephone subscribers' identification numbers, had a friend reprogram three chips with these numbers, and inserted the chips in cellular phones so that calls would be billed to these account holders. Then he placed long distance calls for himself and his friends, charging the friends for his trouble. This scheme violated 18 U.S.C. § 1029(a)(1) [producing, using or trafficking in counterfeit access devices]." (2 F.3d at p. 246.)

---

ber, or other telecommunication service, equipment, or instrument identifier." Other parts of the statute were also amended. (See discussion, *post*.)

In *Brewer, Teehee* and *Ahmad,* three different circuits gave a broad interpretation to "access device" to bring within its coverage fraudulent practices in unlawfully obtaining telephone services. In each case the defendant used a "means of account access" (18 U.S.C. § 1029(e)(1))—either the long distance codes or a cloned cellular phone—to charge telephone service to the accounts of unsuspecting subscribers. In *U.S.* v. *Brady* (D.Utah 1993) 820 F.Supp. 1346, another cellular phone case, the court's focus was less on whether a cellular phone is an access device under 18 United States Code section 1029 but on whether the particular fraudulent practice engaged in by the defendant accessed an "account" within the meaning of the statute. Nevertheless, *Brady* is instructive both because it provides the first in depth assessment of the legislative history of 18 United States Code section 1029, and because it presaged a split in the circuits which, in turn, prompted further federal legislation.

Much like the California legislative history of Senate Bill No. 2392, in 1984 Congress intended its new statute to address criminal activity involving credit and other types of cards. *Brady* pointed out that as "capsulized by the *Department of Justice Manual,* the legislative history reflects that 'Congress intended that prosecutions for the use of "unauthorized access devices" be directed to activity involving a criminal or an organized crime ring that traffics in fraudulent credit cards.' " (820 F.Supp. at p. 1349.) The House committee report on the statute stated that "access device" "would cover credit cards, debit cards, account numbers, and combination of these and other methods of obtaining money, goods and services." (*Ibid*). It then went on to state: "The definition of this term is broad enough to encompass future technological changes and *the only limitation* i.e., '(other than a transfer originated solely by paper instrument)' excludes such activities as passing forged checks." (*Ibid.,* italics added.)

The district court noted that further indication that Congress intended 18 United States Code section 1029 to be interpreted broadly to cover crimes employing emerging technology was found in the use of the phrase "alone or in conjunction with another access device . . . ." (18 U.S.C. § 1029(e)(1).) According to the House committee report, that phrase was "intended to cover any account access elements or means of identification currently available or that may become technologically available, which may be used in connection with accounts but which themselves may not be 'access devices.' An example of this would be personal identification number (PIN) which may be used in connection with card access devices." (820 F.Supp. at p. 1350.)

The *Brady* court recognized that the House committee report did not address the question of cellular phones. The only reference to telephone was

in the use of credit card information over the telephone to "obtain money, goods or services other than use of the telephone system itself." (820 F.Supp. at p. 1350.) Finally, the court observed that the House committee report disclosed a "legislative purpose principally, but not exclusively focused upon fraud involving traditional credit cards." (*Ibid.*)

In *Brady*, the defendant was accused of using a cellular phone in violation of 18 United States Code section 1029(a)(1) for knowingly, and with the intent to defraud, producing, using or trafficking in one or more counterfeit access devices. In ruling on a motion to dismiss the indictment, the court stated: "Based upon the testimony and argument offered at the hearing, there appears to be little doubt that a 'cloned' cellular phone—one with an ESN and MIN identical to another existing but legitimate unit—would represent an 'access device" clearly falling within the ambit of section 1029(a)(1)." (820 F.Supp. at p. 1348.)

The court, however, dismissed the indictment because the defendant had possessed not a "cloned" phone but a cellular phone capable of "free riding." The difference between free riding and cloning is significant not only to the decision in *Brady* but to the two circuit Court of Appeals decisions which refused to follow *Brady*. Accordingly, we examine further these two fraudulent activities.

As the Air Touch Cellular witness testified in the present case, cloning involves the unauthorized use of an ESN and MIN combination assigned to a lawful subscriber. The telephone call made on the cloned phone is unlawfully charged to the subscriber's account because it appears as if it had been made from the subscriber's phone. Free riding, not involved in the present case, is the use of a cellular phone which has been programmed to avoid or defeat access or billing to an individual account through a process known as "tumbling." Tumbling involves "changing either the ESN or the MIN (or both) programmed into a particular cellular telephone instrument, often using numbers chosen at random." (*U.S.* v. *Brady, supra,* 820 F.Supp. at p. 1348, fn. 7.) Free riding enables the caller to make a single free call with any combination of ESN's and MIN's because it is the first call with any combination of numbers that enables the carrier to confirm the validity of the combination. If the carrier's computer system does not confirm the "transmitted combination as a valid match of customer or subscriber ESN and MIN numbers, further calls using the same combination are intercepted, effectively locking out further use of the system to place additional calls." (820 F.Supp. at p. 1354, fn. omitted.) However, before the "lock out" on that combination occurs, a free rider is able to make one call with the two numbers. The process then can be repeated with other combinations.

The *Brady* court held that since free riding did not impose a charge on the account of the lawful subscriber but only represented a loss of business opportunity to the cellular carrier, free riding did not access identifiable accounts and therefore was not a "means of account access" under 18 United States Code section 1029(e)(1). (820 F.Supp. at pp. 1352, 1358.) In reaching this conclusion the district court distinguished between cloned and free riding devices, calling the former a "true account 'access device' . . . ." (820 F.Supp. at p. 1359.) The decision of the district court was affirmed on appeal. (*U.S.* v. *Brady* (10th Cir. 1993) 13 F.3d 334.)[7]

The issue before the court in *Brady*—whether prosecution under 18 United States Code section 1029 was limited to those cases where the perpetrator obtained access to a subscriber's account—was considered and answered in the negative by the Ninth and Sixth Circuits in *U.S.* v. *Bailey* (9th Cir. 1994) 41 F.3d 413 and *U.S.* v. *Ashe* (6th Cir. 1995) 47 F.3d 770, respectively. In *Ashe*, the court also addressed the tumbling of cellular phone identification numbers and concluded that the activity accessed accounts of the MIN identified home carrier which was contractually obligated to reimburse a foreign carrier whose services were used by the free rider. "This court accordingly concludes that a converted 'tumbling' cellular telephone is a device which is capable of accessing cellular telephone carrier accounts by transmitting counterfeit MIN and ESN signals that permit illicit 'roamers' to fraudulently obtain free air time." (47 F.3d at p. 774.) It affirmed defendants' convictions under 18 United States Code section 1029.

In *Bailey*, the defendant created a slightly different fraudulent scheme. He manufactured computer chips used in tumbling cellular phones. After a jury convicted him of violating 18 United States Code section 1029(a), the district court granted a motion for acquittal. The government appealed, and the Ninth Circuit reversed. The defendant argued that no "account" was ever accessed because the ESN's broadcast by his invention did not correspond to accounts of real customers. The court acknowledged that the statute did not define account but thought it unlikely "that Congress was worried about the literal numbers on a ledger; instead, the purpose of the statute is to deal with the abuse of new technologies that increasingly allow individuals and businesses access to goods and services without immediate payment by cash or familiar, paper instruments. When the statute refers to 'account access,' it evidently means access to the privileges permitted by virtue of the maintenance of an account." (41 F.3d at p. 417.) The fact that there were existing accounts between local and distant carriers which were adjusted because of

---

[7]The Tenth Circuit in *Brady* did not decide whether a cloned cellular phone would represent a means of account access within 18 United States Code section 1029 since that determination was unnecessary to its decision. (*U.S.* v. *Brady, supra*, 13 F.3d at p. 337, fn. 3.)

defendant's scheme was sufficient to bring the activity within the statute even if no account of an "end customer" (i.e., telephone subscriber) was accessed. (41 F.3d at p. 418.)

Although the various federal decisions (except *Ahmad*) involve activities or devices slightly different than the present case, and notwithstanding the disagreement among the circuits on the issue of free riding, each of the federal cases recognize that telephone service fraud (whether it be by cellular phone or long distance access codes) is covered by 18 United States Code section 1029 even in the absence of express statutory language.

Congress was not unmindful, however, of the division in the circuits on the issue of free riding. In 1994 it expressly expanded the definition of access devices to include "electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier . . . ." (Pub. L. No. 103-414 (Oct. 4, 1994) 108 Stat. 4279, § 206(c)(1), 1994 U.S. Code Cong. & Admin. News, No. 140.) The legislative history reveals that the amendment was in direct response to the unresolved free riding issue. "This section amends the counterfeit access device law to criminalize the use of cellular phones that are altered, or 'cloned,' to allow free riding on the cellular phone system." (House Judiciary Com., Rep. No. 103-827, accompanying Pub.L. No. 103-414 (Oct. 4, 1994), reprinted in 1994 U.S. Code Cong. & Admin. News, pp. 3489, 3511.) Each of the cited cases interpreted 18 United States Code section 1029(e)(1) as it existed *before* the 1994 amendments.[8]

## D. *General Statute v. Specific Statute*

 Defendant argues that even if his conduct violated section 484e, subdivision (c), he cannot be prosecuted under that statute, and prosecution is limited to section 502.7, subdivision (b)(1) because the former is a general statute and the latter a specific statute on the same subject. We assume without deciding that section 502.7, subdivision (b)(1), is properly characterized as a specific statute to section 484e, subdivision (c)'s more general language.

Defendant correctly states the rule that "[p]rosecution under a general statute is precluded by a special statute when the general statute covers the same matter as, and thus conflicts with, the special statute. [Citations.]" (*People* v. *Rousseau* (1982) 129 Cal.App.3d 526, 534 [179 Cal.Rptr. 892].) This is not, however, a rule of substantive law. The substantive law governing multiple prosecutions and punishments is found in section 654 and the

---

[8]In *United States* v. *Yates* (E.D.Ky. 1995) 914 F.Supp. 152, the district court concluded that amended 18 United States Code section 1029(a) applied to "black boxes" used to clone cellular telephones.

principles of double jeopardy. (See generally, 3 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) § 1382 et seq.) Rather, the general/specific rule is a tool to effect legislative intent. ■ "The doctrine that a specific statute precludes any prosecution under a general statue is a rule designed to ascertain and carry out legislative intent. [Fn. omitted.] The fact that the Legislature has enacted a specific statute covering much the same ground as a more general law is a powerful indication that the Legislature intended the specific provision alone to apply. Indeed, in most instances, an overlap of provisions is determinative of the issue of legislative intent and 'requires us to give effect to the special provision alone in the face of the dual applicability of the general provision . . . and the special provision . . . .'" (*People* v. *Jenkins* (1980) 28 Cal.3d 494, 505-506 [170 Cal.Rptr. 1, 620 P.2d 587], citation omitted.)

However, because the general/specific rule is designed to determine legislative intent, the rule must give way when there is indication that no such intent exists. "In this limited situation, the usually decisive rule that a specific statute precludes prosecution under a general statute cannot apply." (*People* v. *Jenkins, supra,* 28 Cal.3d at p. 506.)

■ Coincidentally, much of the appellate case law on this subject is derived from the very statutes involved in this case: section 484d et seq. and the repealed section 484a. In *People* v. *Swann* (1963) 213 Cal.App.2d 447 [28 Cal.Rptr. 830], the Court of Appeal was confronted with the question of whether prosecution for credit card forgery under section 470, the general forgery statute, was precluded by section 484a, the then existing credit card statute. The court concluded that ". . . the People do not have the power to prosecute under the general felony statute [section 470] in a case such as this where the facts of the alleged offense parallel the acts proscribed by a specific statute [section 484a]." (213 Cal.App.2d at p. 449.) The holding in *Swann* was approved in *People* v. *Ali* (1967) 66 Cal.2d 277, 279 [57 Cal.Rptr. 348, 424 P.2d 932], another credit card prosecution case.

As noted earlier, in 1967 the Legislature repealed section 484a and replaced it with comprehensive credit card legislation, new section 484d et seq. The new statute contained an uncodified section 8 which read: "This act shall not be construed to preclude the applicability of any other provision of the criminal law of this state which presently applies or may in the future apply to any transaction which violates this act." (Stats. 1967, ch. 1395, § 8, p. 3260.) The report of the 1967 Assembly Committee on Criminal Procedure states at page 16: "Section 9 [ultimately section 8] of the bill provides that any transaction which violates the terms of this bill and at the same time violates any other provision of the law is prosecutable under *either* provision." (Italics added.) "The use by the Legislature in section 8 of the

language 'any other provision of the criminal law' is all-encompassing, making no distinction between general or special statutes as long as the criminal activities are within the proscribed scope of such enactments." (*People* v. *Liberto* (1969) 274 Cal.App.2d 460, 464 [79 Cal.Rptr. 306].) Following the passage of the 1967 amendments, a series of cases held that section 484d et seq. did not bar prosecution under other statutes. (See, e.g., *People* v. *Gingles* (1973) 32 Cal.App.3d 1030, 1035-1037 [108 Cal.Rptr. 744]; *People* v. *Liberto*, *supra*, at p. 464.)

We conclude that the amendment to the Penal Code just described is exactly the type of "contrary legislative intent" referred to by the Supreme Court in *Jenkins* as an exception to the rule that a defendant usually may not be prosecuted under a general statute when there exists a specific statute covering the same subject matter. (*People* v. *Jenkins*, *supra*, 28 Cal.3d at p. 506.)

E. *Analysis*

■ Having considered the two statutes under which defendant was prosecuted, applicable federal law, and state and federal legislative histories, we conclude that defendant was properly convicted of receiving access cards with the intent to defraud when he had in his possession two cloned cellular phones. Part of the difficulty in reaching this conclusion is due to semantics, as that word is used to describe the study of meanings. A card may not seem to be a phone, nor is it commonly "a code, account number or other means of account access." If the Legislature had borrowed the phrase "access device" and not just its definition, application of the statute to cellular phones would be facially sensible.

Yet, the history is clear that the Legislature intended "access card" to have the same meaning as the federal "access device." Accordingly, the federal cases construing access devices to include cloned cellular phones are highly persusasive. Moreover, we properly assume that when the Legislature expressly referred to the federal statute that it had considered not only the words of 18 United States Code section 1029 themselves but also the legislative history of the federal law. (*Cf. People* v. *Liberto*, *supra*, 274 Cal.App.2d at p. 464 [it is assumed that the Legislature in amending a law is familiar with existing judicial decisions construing the same or related legislation].) Thus, the Legislature intended that the definition of access card be broad enough to cover future technologies, the only limitation being on purely paper transactions. As the evidence disclosed here, a cloned cellular phone is a sophisticated and unlawful "means of account access" to the account of a legitimate telephone subscriber.

Finally, in expressly authorizing prosecutions under section 484d et seq. even where conduct could also be charged under other penal statutes, the Legislature revealed a manifest purpose that because the access card statutes are broadly worded, they are to be important weapons against fraudulent consumer and business practices, no matter how technologically adept the perpetrator may be. This was the conclusion reached under federal law in each of the cases which addressed the subject, a conclusion with which we agree.

IV.

*The Trial Court Was Not Required to Instruct on*
*Section 484e, Subdivision (a)*

Defendant argues that section 484e, subdivision (a), misdemeanor acquisition of an access card without consent, is a lesser included offense to section 484e, subdivision (c) of which he was convicted. Accordingly, the trial court had an obligation to instruct sua sponte on the lesser offense. No such instruction was given. Section 484e, subdivision (a) provides: "Every person who acquires an access card from another without the cardholder's or issuer's consent or who, with knowledge that it has been so acquired, acquires the access card, with intent to use it or to sell or transfer it to a person other than the issuer or the cardholder is guilty of petty theft."

Generally, a trial court on its own motion must instruct on all lesser included offenses as part of the court's duty to instruct on all applicable principles of law raised by the evidence. (See 5 Witkin & Epstein, Cal. Criminal Law, *supra*, § 2926, pp. 3587-3589.) A lesser included offense is one that is necessarily committed when another, greater offense is committed. (*People* v. *Pendleton* (1979) 25 Cal.3d 371, 382 [158 Cal.Rptr. 343, 599 P.2d 649].) Defendant's major premise is flawed, however, since one can violate section 484e, subdivision (c) without necessarily violating section 484e, subdivision (a); hence, the latter is not a lesser included offense. Section 484e, subdivision (a) requires that the accused acquire an access card either without the consent of the cardholder or issuer, or with the knowledge that it has been previously so acquired. No such requirement is found in section 484e, subdivision (c). Thus, if the accused were given a card by a third person who had lawfully acquired it from the holder or issuer and at the time of acquisition the accused had the intent to defraud, the accused would be in violation of section 484e, subdivision (c) but not section 484e, subdivision (a). At most, the two statutes involve related offenses. A trial court has no obligation to instruct sua sponte on lesser related offenses. (*People* v. *Hawkins* (1995) 10 Cal.4th 920, 952 [42 Cal.Rptr.2d 636, 897 P.2d 574].)

Even if section 484e, subdivision (a) were a lesser included offense, no instruction would be warranted under the evidence adduced at the trial. ■ "A trial court must instruct sua sponte on a lesser included offense 'only if there is substantial evidence to support a jury's determination that the defendant was in fact *only* guilty of the lesser offense.' [Citation.]" (*People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 127 [2 Cal.Rptr.2d 335, 820 P.2d 559], vacated on other grounds, *Bacigalupo* v. *California* (1992) 506 U.S. 802 [121 L.Ed.2d 5, 113 S.Ct. 32], on remand, 6 Cal.4th 457 [24 Cal.Rptr.2d 808, 862 P.2d 808]; *People* v. *Masters* (1982) 134 Cal.App.3d 509, 517 [185 Cal.Rptr. 134].) ■ Here, the uncontradicted evidence was that defendant was using a cellular phone when the police arrived at the scene and in the few days before his arrest had used the phones to place calls to his wife. He thus had the intent to defraud (and carried out that intent) which was an element of section 484e, subdivision (c) but not of section 484e, subdivision (a). There was no substantial evidence that he was guilty *only* of the lesser offense.

## V.

### *Defendant Was Properly Sentenced Under the Three Strikes Law*

■ Defendant contends that he should not have been sentenced under the three strikes law for several reasons. First he argues that under section 667, subdivision (d)(1) a determination that a prior conviction is a strike must be made at the time of the conviction, and no such determination was made in 1978 when he was convicted of robbery. This argument is without merit. Subdivision (d)(1) "does not require the determination whether a prior conviction is a 'strike' to be made *at the time* of the prior conviction, but simply *by reference to* the date of the prior conviction, and thus the Three Strikes law applies to prior felony convictions predating its enactment." (*People* v. *Reed* (1995) 33 Cal.App.4th 1608, 1612 [40 Cal.Rptr.2d 47], original italics.)

In a slight variation on his first argument, defendant also contends that his prior conviction does not qualify as a strike because in 1978 robbery was neither a serious nor violent felony under then existing statutes. Only serious and violent felonies qualify as strikes. (§ 667, subd. (d)(1).) Section 1192.7 which lists robbery as a serious felony was enacted by the voters in 1982 as part of Proposition 8. Section 667.5, which defines violent felonies, was enacted in 1977 prior to defendant's conviction, but it includes only certain residential robberies and, defendant argues, there is no evidence that defendant's conviction was of such a nature.

Defendant relies on the following statement by Division Two of this district in *People* v. *Green* (1995) 36 Cal.App.4th 280, 283 [42 Cal.Rptr.2d 249]: "We thus interpret the phrase in section 667, subdivision (d)(1) that '[t]he determination [as to whether a prior offense qualifies as a "strike"] . . . shall be made upon the date of that conviction' to mean that the court is presently required to look backward to see if, at the time of the conviction of the past offense, such past offense qualified as a serious or violent offense under section 1192.7, subdivision (c) or section 667.5, subdivision (c)." Defendant reasons that since in 1978 his robbery was neither a serious nor a violent felony under those statutes a backward look in time compels the conclusion that he did not suffer a prior strike conviction.

The same contention was made in *People* v. *Moenius* (1996) 46 Cal.App.4th 600 [49 Cal.Rptr.2d 263] review granted April 11, 1996 (S052010). There, Division Two, the same court that decided *Green*, rejected the argument that serious felony convictions which antedated the enactment of section 1192.7 did not qualify as strikes. The court initially stated that reliance on *Green* was misplaced because the prior conviction in *Green* occurred in 1987, after the effective date of section 1192.7. Instead, the court relied on section 667, subdivision (h) which provides: "All references to existing statutes in subdivisions (c) to (g), inclusive, are to statutes as they existed on June 30, 1993." In *Moenius* because burglary was a serious felony under section 1192.7 as it existed on June 30, 1993, the court held that the defendant's 1974 burglary conviction qualified as a strike under section 667, subdivision (d)(1). (46 Cal.App.4th at p. 608, review granted April 11, 1996 (S052010).) "The Three Strikes law also applies to felony convictions which were neither 'serious' nor 'violent' felonies at the time of conviction, but which again fit the definition of 'serious felony' or 'violent felony' on the relevant date [June 30, 1993]." (*Gonzales* v. *Superior Court* (1995) 37 Cal.App.4th 1302, 1311, fn. omitted [44 Cal.Rptr.2d 144]; see also *People* v. *Turner* (1995) 40 Cal.App.4th 733, 738-739 [47 Cal.Rptr.2d 42].) We agree. Since robbery was a serious felony under section 1192.7 as it existed on June 30, 1993, defendant's 1978 robbery conviction qualified as a strike.

Defendant also argues that the three strikes law was not a proper subject of urgency legislation and violates the principal of separation of powers because it unlawfully usurps prosecutorial discretion. These, arguments were rejected in *People* v. *Cartwright* (1995) 39 Cal.App.4th 1123, 1133-1134 [46 Cal.Rptr.2d 351], and *People* v. *Kilborn* (1996) 41 Cal.App.4th 1325, 1332 [49 Cal.Rptr.2d 152], respectively, for reasons we find persuasive.

## VI.

### *Section 654 Prohibits Punishment for the Section 502.7 Violations*

■ Defendant's final argument is that pursuant to section 654 he was improperly sentenced on counts 2, 3 and 4 all of which were ordered to run concurrent with his state prison sentence on count 1. Section 654 generally prohibits multiple punishment "when there is a course of conduct which violates more than one statute but constitues an indivisible transaction. [Citation.]" (*People* v. *Saffle* (1992) 4 Cal.App.4th 434, 438 [5 Cal.Rptr.2d 648].)

To the extent defendant is arguing that he could only be punished once even though he was apprehended using two phones because he possessed those phones at the same time, we dispense with that argument in short moment. Defendant's crimes were committed against two different victims, the lawful owners of the two cellular phone numbers. As such he can be punished separately for each crime. (*In re Dennis C.* (1980) 104 Cal.App.3d 16, 22 [163 Cal.Rptr. 496].) The trial court properly sentenced defendant on both counts 1 and 2 (the two § 484e, subd. (c) charges).

We agree with defendant that he cannot be punished separately on counts 3 and 4 under section 502.7 for possessing the same phones on which the section 484e, subdivision (c) convictions were based. Although the intent requirements of the two statutes differ slightly, as applied to defendant he possessed the two phones with the mental state to defraud by avoiding lawful telephone charges. The possession of each phone was a single act with a single objective. (*People* v. *Harrison* (1989) 48 Cal.3d 321, 335 [256 Cal.Rptr. 401, 768 P.2d 1078].)

The trial court should have stayed the imposition of sentence on counts 3 and 4. Where multiple punishment has been improperly imposed, ". . . the proper procedure is for the reviewing court to modify the sentence to stay imposition of the lesser term. [Citation.]" (*People* v. *Martinez* (1985) 171 Cal.App.3d 727, 736 [217 Cal.Rptr. 546].)

## VII.

### *Disposition*

Defendant's sentence is modified so that execution of the sentence imposed for counts 3 and 4 is stayed pending the finality of the judgment and service of the sentence for counts 1 and 2, the stay to become permanent

upon completion of the terms imposed for counts 1 and 2. In all other respects, the judgment is affirmed.

Epstein, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied April 16, 1996, and appellant's petition for review by the Supreme Court was denied June 26, 1996.